UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

```
                                          )
BENARD INDUSTRIES, INC. d/b/a             )
OTC PHARMACEUTICAL PRODUCTS,              )
                                          )    CIVIL ACTION NO.
      Declaratory-Judgment Plaintiff      )    95-1593-CIV-LENARD
      and Counterclaim Defendant,         )    Magistrate Johnson
                                          )
vs.                                       )
                                          )
BAYER AKTIENGESELLSCHAFT,                 )
                                          )
      Declaratory-Judgment Defendant      )
      and Counterclaim Plaintiff.         )
                                          )
```

## OTC'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO COUNTS I-IV RE: DOMESTIC TRADEMARK USE AND REGISTRATION AND BAYER'S DEFENSE OF UNCLEAN HANDS

COMES NOW the Plaintiff/Counter-Defendant, Benard Industries, Inc. d/b/a OTC Pharmaceutical Products ("OTC"), by and through its undersigned counsel, and hereby moves this Court, pursuant to Fed.R.Civ.P. 56 and Local Rule 7.5, to enter an Order granting OTC partial summary judgment in its favor and against Defendant/Counter-Plaintiff, Bayer Aktiengesellschaft ("Bayer"), regarding OTC's use and registration of the trademark "CANESTEN" in the United States. Additionally, OTC seeks partial summary judgment as to Bayer's Second Affirmative Defense, namely unclean hands and bad faith.

In support hereof, OTC respectfully represents the following:

## LOCAL RULE 7.5 STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE

A.    OTC is a Florida corporation having its principal place of business at 9300 N.W. 25th Street, Suite 104, Miami, Florida 33172. [Benard Decl.].

B.    OTC is in the business of distributing over-the-counter vitamins and pharmaceuticals under generic designations and OTC's

own private labels. OTC causes the manufacture of such products through manufacturing sources in the United States. [Benard Dep., p.24]; [Benard Decl.].

C. OTC first adopted and began to use the "CANESTEN" trademark on anti-fungal products in the United States at least as early as December of 1987. OTC began using the "CANESTEN" trademark in interstate commerce at least as early as November 15, 1988. OTC's use has been continuous since that time. [Benard Dep., p.38].

D. OTC's packaging for its "CANESTEN" product was designed by an independent commercial artist. The artist utilized design features that are common for product packaging. Additionally, the artist referred to sample packaging of a product offered by OTC's manufacturer. OTC's manufacturer provided the sample packaging for that purpose. [Quesada, pp. 13-28, 58-61, 75-81, and Exhibits]; [Benard Dep., pp. 54-61, 226-231].

E. Shortly after commencing use, OTC sought and obtained advice, including a trademark search, from competent trademark counsel resulting in a written recommendation that OTC should proceed with "the adoption and use" of the "CANESTEN" trademark in the United States. [Berman, p.6 and Exhibit].

F. In November 1989, OTC filed an application to register the trademark "CANESTEN" for anti-fungal cream with the United States Patent and Trademark Office. [Bayer's Response to OTC's Request for Admission No.6] (hereinafter "Admission"). The application was examined substantively by the Attorney Examiner and published for opposition in the Official Gazette of the United States Patent and Trademark Office in July 1990. [Trademark Manual of Examining Procedure, Chapter 12]; [Admission No. 7]. Bayer had knowledge of the publication, but chose not to oppose. [Pastor,

ii

p.175-178]; [Admission No. 8].   On October 2, 1990, the United States Patent and Trademark Office granted a U.S. Trademark Registration to OTC, U.S. Registration No. 1,615,407, for the trademark "CANESTEN" on anti-fungal cream. [Admission No. 9].

G.   Bayer is a corporation of the Federal Republic of Germany, with its headquarters in Leverkusen, Germany, and maintains subsidiary corporations in many countries of the world. [Pastor, p. 42]; [Oldigs, p.42-43].

H.   Bayer has never used the trademark "CANESTEN" in the United States. [Benard Decl.]; [Hanlon, pp. 18, 59]; [Oldigs, p. 261].

I.   Bayer claims to use the trademark "CANESTEN" in foreign countries for its clotrimazole anti-fungal products. [Bremmers, pp. 20-21]; [Hanlon, p. 49].   Bayer does not use the trademark "CANESTEN" for any other products. [Hanlon, p. 51-52].   It is Bayer's practice to sell its clotrimazole product under only one trademark in a particular country, unless otherwise required by law. [Hanlon, p.68]; [Bremmers, pp.20-21, 94-95].

J.   Bayer appears to have obtained registrations for the trademark "CANESTEN" in foreign countries. [Pastor, p.83].

K.   Bayer executives are not aware of purposeful promotions or advertisements for the "CANESTEN" product to the United States. [Pastor, p. 112]; [Hanlon, pp.18-19].   Some notations regarding Bayer's "CANESTEN" product may appear in desk reference books, which may have limited availability in the United States. [Bayer's Response to Interrogatory No. 19] [Hanlon, pp. 23-24]. After OTC's first use in the United States, Bayer has advertised the "CANESTEN" product in a Canadian publication that has a small number of subscribers in the United States. [Hanlon, pp. 76-77].

L.   Bayer's "CANESTEN" product, being a clotrimazole product,

has been classified as a prescription drug in most countries until recently. [Oldigs, pp. 97-98, 163-65]; [Hanlon, pp. 53-54].   In Latin America, Bayer directs promotions and advertisements for its prescription drugs to health care professionals only.  The general Latin American public is exposed only to limited promotions and advertisements inside pharmacies in the form of shelf displays and wall posters.  [Oldigs, pp. 126-29, 170-71].

M.   Bayer made a conscious decision not to use or register the "CANESTEN" trademark in the United States.  Instead, since 1975, Bayer has sold and continues to sell its clotrimazole product in the United States solely under the "MYCELEX" trademark. [Hanlon, pp. 17, 59, 69]; [Oldigs, pp. 259, 261]; [Pastor, pp. 127-28 and Exhibit]; [Bremmers, p. 30].   Bayer owns a U.S. Trademark Registration, U.S. Registration No. 1,060,584, for the "MYCELEX" trademark on dermatological products.

N.   In 1977, Bayer applied to register the trademark "CANESTEN" in the United States for pharmaceutical preparations, but that application was withdrawn by Bayer.  Bayer has never again applied to register "CANESTEN" in the United States. [Pastor, pp. 82-84].

O.   The "CANESTEN" trademark is not well-known or famous in the United States, among neither the general nor Spanish-speaking populations. [Rappeport Decl. and Exhibit]; [Oldigs, pp. 131-133]; [Pastor, pp. 187-91]; [Benard Dep., pp.245-246]; [Benard Decl.]; [Navarro, pp.124-126].

P.   At the time that OTC adopted and began to use the "CANESTEN" trademark in the United States, Bayer did not have any bona fide intention to use the "CANESTEN" trademark in the United States. [Pastor, p. 114].  To this day, Bayer still does not have a definitive intention to use the "CANESTEN" trademark in the U.S.,

but rather considers it to be an "option." [Hanlon, pp. 65-66].

Q.   Prior to 1979, OTC's principal, William Benard, saw a brochure bearing the name "CANESTEN" in a doctor's office in Nicaragua. Mr. Benard had no knowledge of the owner of the mark or the extent of use, if any, of the trademark "CANESTEN." [Benard Dep., p.39]; [Benard Decl.]. Many years after seeing the brochure in Nicaragua, Mr. Benard chose that name for OTC's products.

R.   Mr. Benard immigrated to the United States in 1979 and has never since been back to Nicaragua. He never again saw or heard of the name "CANESTEN" until OTC was contacted by Bayer's attorneys in 1995. [Benard Dep., p.39]; [Benard Decl.].

S.   When OTC adopted and began to use the "CANESTEN" trademark, neither Mr. Benard nor OTC believed that a name, seen on a brochure years before in Nicaragua, would be in continuous use through the Nicaraguan civil war and the Sandinista regime. [Benard Dep., pp.240-242]; [Benard Decl.].

T.   OTC has had to work very hard to make sales of its "CANESTEN" product in the United States over the past nearly (8) years, investing significant amounts of time and money in advertisement, promotion, and personal solicitations across the United States. Sales of the product have steadily increased from their meager beginnings. [Benard Dep., p.245]; [Benard Decl.].

U.   The parties are not aware of a single instance of actual confusion in the United States, or elsewhere, resulting from OTC's use of its "CANESTEN" trademark or any other conduct of OTC. [Benard, pp. 234-35]; [Pastor, pp. 183-85]; [Oldigs, pp. 114-15].

V.   Upon being contacted by Bayer's attorneys in 1995, OTC voluntarily undertook to substantially modify its packaging (trade dress) by drastically changing the dominant color and design features. [Benard Dep., p.77-80, 226-227]; [Benard Decl.]. Bayer

does not view this new trade dress to be confusingly similar or otherwise infringing, except for the "CANESTEN" trademark. [Pastor, p.135 and Exhibit]. At this time, OTC has completely changed over to the new trade dress. [Benard Decl.]

W. Bayer has known about OTC's use of the "CANESTEN" trademark in the United States since 1989, at least. [Admission No. 33]; [Answer to Interrogatory No. 23]; [Pastor, pp. 154-57]. Bayer also knew in 1990 that OTC was approved by the United States Patent and Trademark Office to receive a U.S. Trademark Registration for the trademark "CANESTEN" on anti-fungal cream, which was issued as U.S. Registration No. 1,615,407. [Pastor, pp. 175-76]. Bayer decided "not to interfere." [Pastor, p. 178].

## MEMORANDUM OF LAW

As discussed more fully below, the issues before the Court regarding domestic trademark use and registration fit squarely within the holding of <u>Person's Co. v. Christman</u>, a 1990 decision from the United States Court of Appeals for the Federal Circuit, affirming a Trademark Trial and Appeal Board ("TTAB") decision. <u>Person's Co. v. Christman</u>, 900 F.2d 1565, 14 USPQ2d 1477 (Fed. Cir. 1990), <u>aff'g</u> 9 USPQ2d 1477 (TTAB 1988). Similarly, Bayer's affirmative defense of unclean hands and bad faith is directly refuted by <u>Bulk Mfg. Co. v. Schoenbach Prods. Co.</u>, 208 USPQ 664, 667-68 (S.D.N.Y. 1980)("[D]efense of unclean hands is inapplicable here."). These issues are not novel; they are fully addressed in the trademark treatises. 4 McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u> §29.01[2] (1995) (listing cases). The <u>Person's</u> case is dispositive of both the issue of cancellation of OTC's U.S. Registration No. 1,615,407 for the "CANESTEN" trademark, contained in Count III of the Re-Amended Counterclaims, and the issue of OTC's continued domestic use of the "CANESTEN" trademark, contained in Counts I, II, and IV.

There is no factual dispute on any issue material to the resolution of the case on these issues. Summary judgment is as appropriate in a trademark infringement case as in any other case. <u>Chanel Inc. v. Italian Activewear of Fla. Inc.</u>, 931 F.2d 1472, 19 USPQ2d 1068, 1070 (11th Cir. 1991); <u>Copelands' Enters. Inc. v. CNV Inc.</u>, 945 F.2d 1563, 20 USPQ2d 1295 (Fed. Cir. 1991); <u>WSM, Inc. v. Tennessee Sales Co.</u>, 709 F.2d 1048, 220 USPQ 17 (6th Cir. 1983). Therefore, OTC is entitled to partial judgment as a matter of law on Counts I-IV, insofar as they relate to domestic trademark use and registration, and on Bayer's affirmative defense of unclean hands and bad faith.

1

I.   **COUNT III: CANCELLATION OF REGISTRATION.**

Cancellation of a U.S. Trademark Registration is governed by §37 of the Lanham Act, 15 U.S.C. §1119.   The party seeking cancellation has the burden to overcome the evidentiary effect of a U.S. Trademark Registration.   Dymo Indus., Inc. v. Tapeprinter, Inc., 326 F.2d 141, 140 USPQ 154 (9th Cir. 1964).

A.   **Person's Case is Dispositive of Cancellation.**

In Count III of the Re-Amended Counterclaims, Bayer seeks an Order from the Court directing the Commissioner of Patents and Trademarks to cancel OTC's U.S. Registration No. 1,615,407 for the "CANESTEN" trademark.   The Federal Circuit, which is the federal appellate court that specializes in intellectual property, has already decided this same issue of cancellation on facts similar[1] to the facts in this case.   Person's, 14 USPQ2d 1477.   The court held unequivocally that prior use of a trademark in a foreign country does not grant the foreign user any trademark rights in the United States as against one who used an identical trademark in the U.S. prior to entry of the foreigner into the U.S. market.   Id.

The Person's tribunals (the TTAB and Federal Circuit) refused to cancel the U.S. Trademark Registration for "PERSON'S" owned by the U.S. registrant/defendant, Christman, notwithstanding Christman's knowledge of the prior foreign use of the same mark by the petitioner/plaintiff, Person's Co. Id.   The dispositive facts in Person's were that Christman was the senior user of the mark in the United States and that Christman was the first to obtain a U.S. Trademark Registration for the mark. Person's, 14 USPQ2d at 1479. Person's Co. had "no basis upon which to claim priority" and was the junior user of the mark in the United States. Id.   The court

---

[1]   The specific facts of the Person's case vis-a-vis the facts of the instant case are discussed below at Section II.C.

reasoned that "[k]nowledge of a foreign use does not preclude good faith adoption and use in the United States." Id.

In the instant case, OTC is the prior user of the "CANESTEN" trademark in the United States since 1987. Discovery has revealed nothing to the contrary. Moreover, OTC owns U.S. Registration No. 1,615,407 for "CANESTEN" in connection with anti-fungal cream.

By contrast, Bayer has never used the "CANESTEN" trademark in the United States. Bayer does not own a registration for the "CANESTEN" trademark in the United States. At most, Bayer's "CANESTEN" trademark has appeared in some obscure desk reference books and, after OTC's first use of the "CANESTEN" mark, in a Canadian publication that has a small number of subscribers in the United States.

Bayer's entire case is contrary to the well-established law that "foreign use has no effect on U.S. commerce and cannot form the basis for a holding that appellant has priority here." Person's, 14 USPQ2d at 1479. Advertisement in a foreign publication that has a limited circulation in the United States does not constitute use by Bayer of the mark "CANESTEN" in the United States. 4 McCarthy §29.01[2] ("Priority of use in the United States is not established by a foreign mark which may occasionally be found in foreign publications in some libraries in the United States."). See also Mother's Restaurants, Inc. v. Mother's Other Kitchen, Inc., 218 USPQ 1046 (TTAB 1983). Rather, the foreign publications must obtain "such circulation in the United States as to make the relevant public for [the] goods ... aware of [the] use of [the mark]." Sterling Drug Inc. v. Knoll A.-G. Chemische Fabriken, 159 USPQ 628, 630 (TTAB 1968). For purposes of United States trademark law, "use" means bona fide sales in commerce. 15 U.S.C. §1127.

3

For the foregoing reasons, the Roldan decision does not apply to the instant case.  Laboratorios Roldan v. Tex Int'l, Inc., 902 F.Supp. 1555 (S.D.Fla. 1995)(foreigner was first user in U.S.).

B.   **THE PERSON'S EXCEPTIONS DO NOT APPLY**.

The Person's court acknowledged that a different result may have obtained if there had been a finding of bad faith on the part of Christman, the senior U.S. user.  The court declined to find bad faith, however, expressly holding that "[k]nowledge of a foreign use does not preclude good faith adoption." Person's, 14 USPQ at 1480.  The exceptions that may support a finding of bad faith are: (1) the foreign mark is "famous" in the United States or (2) the use is nominal and is made solely to block the prior foreign user's planned expansion into the United States.  Person's, 14 USPQ2d at 1480-81.  As discussed more fully below, and as in the Person's case, itself, "neither of these circumstances is present in this case." Id.

      1.   The "CANESTEN" Trademark is Neither
          Well-Known Nor Famous in the United States.

The simple concept behind the famous marks doctrine, which comports with the international treaties, is that "if a mark used only on products or services sold abroad is so famous that its reputation is known in the United States, then that mark should be legally recognized in the United States."  4 McCarthy §29.01[4]. McCarthy considers this doctrine to be consistent with the general rule of priority, rather than an exception, noting that "it could be said that the foreign business had already established priority in the United States through advertising and reputation prior to defendant's opening." Id.

As noted by McCarthy and the Person's court, the mark must be famous in the United States. It is a fanciful stretch of the imagination to even suggest that Bayer's "CANESTEN" trademark ranks

among the handful of marks that have been considered to be famous or well-known.  See, e.g., All England Lawn Tennis Club, Ltd. v. Creations Aromatiques, Inc., 220 USPQ 1069 (TTAB 1983) ("WIMBLEDON"); Vaudable v. Montmartre, Inc., 193 N.Y.S.2d 332, 123 USPQ 357 (1959) ("MAXIM'S" of Paris).  Indeed, Bayer's own executives do not believe that "CANESTEN" is well-known or famous among the general population of the United States.

OTC has provided ample evidence to support a finding that Bayer's "CANESTEN" trademark is not well-known or famous in the United States, among neither the general nor Spanish-speaking populations.  The record includes a trademark survey, commissioned by OTC, which evaluates the level of recognition among consumers in the United States of the "CANESTEN" trademark.  The results are not surprising; "CANESTEN" is essentially unknown.  In fact, consumers had "heard of" "PASSIDADO", a made-up name, nearly as often as they had heard of "CANESTEN."  Moreover, the principal of OTC, William Benard, has traveled across the United States in order to sell OTC's "CANESTEN" product, but has never known anyone to recognize "CANESTEN."

In a creative effort to escape reality, Bayer attempts to define this case in terms of the Spanish-speaking market, obviously hoping to convince the Court that immigrants recognize "CANESTEN" from their experience in foreign countries.  [Re-Amended Counterclaims, ¶49].  This theory is somewhat dubious.  The Person's decision did not address such a limitation.  Moreover, the laws of other countries indicate that the fame must pervade the country, not just selected areas or groups.  Robert C. Wian Ent., Inc. v. Mady, (1965) 49 DLR 56 (Canadian case requiring fame across Canada).

Nonetheless, the "CANESTEN" trademark is not well-known or famous among Hispanics in the United States. OTC's survey addresses the issue of Hispanics' recognition of "CANESTEN" and concludes that it is, at most, a little-known brand.  Most convincingly, the owner of Navarro Discount Pharmacies, a leading chain of pharmacies serving the Hispanic community in Miami, testified that "CANESTEN" is not well-known among his clientele.   Indeed, Jose Navarro had never even heard of "CANESTEN" prior to receiving a subpoena from Bayer, even though he carries OTC's "CANESTEN" in his own stores.

The first Person's exception does not apply.

### 2.   OTC's Adoption and Use of "CANESTEN" Was Not an Attempt to Block Bayer's Expansion into the United States under that Mark.

Similarly, all evidence refutes the notion that OTC adopted the trademark "CANESTEN" in an effort to block Bayer's use of "CANESTEN" in the United States.   For this reason, the Davidoff decision is inapplicable to the instant case. Davidoff Extension S.A. v. Davidoff Int'l, Inc., 221 USPQ 465 (S.D.Fla. 1983)(limited prior use merely to preempt foreign user).

Prior to its adoption and use of "CANESTEN" in the United States, OTC had no knowledge that Bayer sold a product in foreign commerce also bearing the trademark "CANESTEN." OTC's principal, Mr. Benard, admits to having seen a brochure bearing the name "CANESTEN" in a doctor's office in Nicaragua in 1979, but had no knowledge that this was a Bayer trademark or product.  Awareness of a foreign user, however, without awareness of use in the United States or an intention to use the mark in the United States, does not amount to bad faith.   Person's, 9 USPQ2d at 1480.   OTC's awareness that a product existed in a foreign country bearing the trademark "CANESTEN" does not constitute bad faith.  Id.

Significantly, Bayer made a conscious and deliberate decision

not to use the "CANESTEN" trademark in the United States.  In 1977, long before OTC's first use, Bayer applied to register "CANESTEN" in the United States, but withdrew its application because Bayer decided not to market its product in the United States under the "CANESTEN" mark.  Rather, since 1975, Bayer has sold and continues to sell its clotrimazole product in the United States solely under the "MYCELEX" trademark.  Bayer does not sell its clotrimazole products under the "CANESTEN" trademark in the United States.  Moreover, it is against Bayer's practice to sell its clotrimazole product under two different trademarks in any country, including the United States.    To this very day, Bayer merely considers "CANESTEN" to be an option for the United States market.  OTC could not have intended to block Bayer's expansion if there were no such expansion ever planned by Bayer.

As in Person's, bad faith simply cannot be found on these facts for the simple and undisputed reason that Bayer had no reputation in the United States off of which OTC could have intended to trade.  Id.

C.   **The Treaties Add Nothing to the Established U.S. Law.**

The established U.S. law, as set forth in Person's, is entirely consistent with the Paris Convention and the Pan American Convention. 4 McCarthy §29.27.  The famous marks doctrine is, essentially, the jurisprudential embodiment of international trademark principles.  The treaties do not add substance beyond that which exists under established U.S. law. See, e.g., Vanity Fair Mills, Inc. v. T. Eaton Co., 234 F.2d 633, 109 USPQ 438, 442 (2d Cir. 1956) ("But that protection has its source in, and is subject to the limitations of American law.")(emphasis added).

There is no independent basis for cancellation of OTC's U.S. Trademark Registration under Article 6 bis of the Paris Convention.

Article 6 bis provides in pertinent part:

> "The countries of the Union undertake ... to cancel the registration ... of a trademark which constitutes a reproduction, an imitation, or a translation, liable to create confusion, of a mark <u>considered by the competent authority of the country of registration or use to be well-known in that country</u> as being already the mark of a person entitled to the benefits of this Convention and used for identical or similar goods."

Paris Convention, Article 6 bis.

Following (or perhaps leading) the established U.S. law, it is clear that only well-known marks are entitled to protection under Article 6 bis of the Paris Convention, and that, furthermore, marks are not well-known under the Article unless they are well-known <u>in the country in which they are registered</u>. <u>Id</u>.; <u>See also</u> <u>Person's</u>, 9 USPQ2d at 1480 ("no evidence that petitioner's mark was well known <u>in the United States</u> at the time respondent adopted it"). The <u>Person's</u> court held that "because petitioner's mark was not well known <u>in the United States</u> at the time respondent began using it here, the Paris Convention does not provide petitioner with a proper basis for cancellation of registration." <u>Id</u>. at 1481.

Turning to the Pan American Convention, "[t]oday, this treaty is of little significance in view of the Paris Convention." 4 McCarthy §29.10[2]. Moreover, as set forth under Section III, <u>infra</u>, Bayer lacks standing to assert the Pan American Convention.

The Pan American Convention, Article 7 does not provide an avenue to achieve cancellation. While OTC is using the trademark, OTC is not "applying to register or deposit," as is a prerequisite to the application of Article 7. OTC has already registered its mark, and the time to "oppose" under Article 7 has expired.

> "The Convention of 1929 makes a distinction between the case of an application for registration... and the case of a registration that is already obtained.... The first case is governed by Article 7...."

8

1 Stephen P. Ladas, <u>Patents, Trademarks, and Reciprocal Rights -</u> <u>National and International Protection</u>, 1796 (1975).  Article 7 of the Pan American Convention does not permit cancellation of OTC's trademark registration.  Similarly, as set forth in Section II.D, Bayer has not complied with "the requirements established by the domestic legislation in [the United States]...." Article 7.  The statutory issue in such a case is the phrase "'mark or trade name previously <u>used</u> in the United States by another' in Lanham Act §2(d)." 4 McCarthy §29.01[4] ("likelihood of confusion").  Finally, Bayer has no intention to commence use in the United States, and therefore, cannot claim preferential rights.

Finally, the uncontroverted facts do not support a finding that OTC had "knowledge of the existence and <u>continuous use</u>" of the "CANESTEN" mark.  OTC's principal merely saw a brochure bearing the name "CANESTEN" approximately a decade prior to OTC's adoption of that trademark.  Indeed, there is no basis to even impute knowledge of use, at all.

## II.   UNCLEAN HANDS AND COUNTS I, II, and IV: INFRINGEMENT AND UNFAIR COMPETITION.

### A.   The Reasoning of <u>Person's</u> Also Applies to Infringement and Unfair Competition.

In <u>Person's</u>, the Federal Circuit acknowledged that the jurisdiction in that case was limited to the issue of cancellation. <u>Person's</u>, 14 USPQ2d at 1481.  Nevertheless, there is ample support for the application of the <u>Person's</u> principles, which were derived from unfair competition case law, to claims of infringement and unfair competition.  <u>Person's</u>, 14 USPQ at 1481 (citing <u>Bulk Mfg.</u> <u>Co.</u>, 208 USPQ at 667-68).  The language of the <u>Person's</u> opinion reaches beyond the right to register, clearly bearing upon the right to use a trademark in the face of an unfair competition

claim. Id. ("Knowledge of a foreign use does not preclude good faith adoption and use in the United States.")(emphasis added). See also Wiener King, Inc. v. The Weiner King Corporation, 204 USPQ 820, 828, n.5 (C.C.P.A. 1980)(now Federal Circuit)("The right to register a mark flows from the right to use it."). Accordingly, the Person's decision is dispositive as to Count I, II, and IV.

### B. **Person's Is Not An Aberration**.

The Person's decision is not an aberration. The notion that trademark rights are territorial is well-supported in both trademark treatises and the case law. "Universality" of trademarks is wholly rejected under U.S. law and the treaties. 4 McCarthy 29.01[1]; Restatement (Third) of Unfair Competition §24, comment f (1995). In his authoritative treatise on trademark law and unfair competition, J. Thomas McCarthy states, "Prior use of a trademark in a foreign country does not entitle its owner to claim exclusive trademark rights in the United States as against one who used a similar trademark in the U.S. prior to entry of the foreigner into the domestic American market." 4 McCarthy §29.01[3]. Referring to the Person's decision, McCarthy further points out that "[t]he Federal Circuit in the 'Person's' case saw the result as a necessary application of the concept of territoriality." Id. (emphasis added).

Discussing the same subject, Jerome Gilson, another authority on trademark law and unfair competition, states, "Trademark rights are territorial in nature. Protectible rights in a country depend on compliance with the laws of that country and do not ordinarily extend to another country. Thus, trademark use outside the United States creates no priority rights or rights to protection in the United States. Similarly, a business can establish trademark rights in the United States where the identical mark is owned by

another business in a foreign country." 1 Jerome Gilson, Trademark
Protection and Practice §3.02[2] (May 1996) (emphasis added).

The notion of territoriality is also well supported in the
case law. See, e.g., Scholastic Inc. v. MacMillan Inc., 2 USPQ2d
1191, 1196 n.6 (S.D.N.Y. 1987) ("extensive use of [a trademark] in
Canada and Australia is, of course, of no relevance to its effort
to create trademark rights in the United States"); Fuji Photo Film
Co. v. Shinohara Shoji Kabushiki Kaisha, 225 USPQ 540, 546 (5th
Cir. 1985) ("The concept of territoriality is basic to trademark
law ... It is well settled that foreign use is ineffectual to
create trademark rights in the United States."); CBS, Inc. v.
Logical Games, 221 USPQ 498, 501 (4th Cir. 1983) ("[T]rade dress
use in foreign countries does not create protectible trademark
rights in the United States."); Nark, Inc. v. Noah's, Inc., 212
USPQ 934, 940 (TTAB 1981) ("activities in a foreign country
generally have no bearing on a question of ownership of a mark in
this country"); Bulk Mfg. Co., 208 USPQ at 667-68 ("The use of a
trademark in a foreign country does not prevent its adoption and
use in this country by another in good faith prior to the entry of
the foreigner in the domestic market.") (copying a foreign
company's mark and product in the United States, where the foreign
company did not compete, "can hardly be considered unscrupulous
commercial conduct"); La Societe Anonyme des Parfums le Galion v.
Jean Patou, Inc., 18 USPQ 545, 547 n.4 (2d Cir. 1974) ("It is well
settled that foreign use is ineffectual to create trademark rights
in the United States."); Johnson & Johnson v. Diaz, 339 F. Supp.
60, 172 USPQ 35, 37 (C.D. Cal. 1971) ("prior use of a trademark in
a foreign country does not entitle its owner to claim exclusive
trademark rights in the United States against one who, in good
faith, has adopted a like trademark of the same character prior to

11

entry of the foreigner into the domestic market"); <u>Sterling Drug Inc. v. Knoll A.-G. Chemische Fabriken</u>, 159 USPQ 628, 630 (TTAB 1968) ("Priority of right in a trademark in the United States depends on priority of use in the United States and is not affected by priority of use in a foreign country."); <u>Cooper's, Inc. v. Jockey Shoe Polish, Inc.</u>, 149 USPQ 704, 706 (TTAB 1966) ("[I]t is well established that use of a mark in commerce outside the United States and the jurisdiction of the Congress cannot establish or create rights in a trademark which a party can properly assert in a proceeding of the character here involved."); <u>The Moxie Co. v. Noxie Kola Co. of N.Y., Inc.</u>, 42 USPQ 443 (S.D.N.Y. 1939) ("The prior use of the words 'Noxie Kola' in Canada by defendants' predecessor, who never sold his product under that name in this country, cannot be urged to protect the Canadian name in the United States, when that name conflicts with a trademark otherwise properly registered here and applied to and identifying a product of a similar class sold for many years in the United States.").

Moreover, both the TTAB and the Federal Courts have followed the <u>Person's</u> decision.  <u>See, e.g.</u>, <u>Linville v. Rivard</u>, 26 USPQ2d 1508, 1512 (TTAB 1993) ("The concept of territoriality is basic to trademark law, and it is a fundamental rule that activity outside of the United States is ineffective to create rights in marks within the United States.") (citations omitted); <u>Financial Matters Inc. v. Pepsico Inc.</u>, 25 USPQ 1456, 1460 (S.D.N.Y. 1992) ("Regardless of any rights that Terek may or may not have in Russia, they do not have rights in the U.S. in the face of a valid, incontestible U.S. trademark. ... Foreign use is ineffectual to create trademark rights in the U.S.").

The foregoing is directly dispositive of Bayer's unclean hands and bad faith defense.  <u>See</u>  <u>Bulk Mfg. Co.</u>, 208 USPQ at 667-68 (unclean hands/bad faith defense held inapplicable).

Numerous commentators, including critics of the decision, have likewise acknowledged that Person's is valid law.  In a Judicial Conference shortly after Person's was decided, Donald Chisum, a renowned intellectual property scholar and author of an authoritative treatise on patent law, called Person's the "top trademark case of [1990]," stating,

> "In a domestic case, a junior user of a mark in one geographic market can obtain valid trademark rights despite another's prior use in another market only if the junior user's adoption is in 'good faith.'  Person's refuses to extend the junior user good faith requirement to prior use abroad."

The Eighth Annual Judicial Conference of the United States Court of Appeals for the Federal Circuit, 133 F.R.D. 245, 296-97 (1990).  As Professor Chisum points out, a different result "must await change by legislation or even by treaties built on reciprocity."  Id.

Refusing to follow the clear holding in Person's would constitute a deviation from judicial precedent tantamount to legislative creation.

### C.   Good Faith vs. Bad Faith

Unfair competition, under the treaties and under U.S. law, requires unscrupulous commercial conduct contrary to good faith. Put succinctly, bad faith is the touchstone of unfair competition. Bulk Mfg Co., 208 USPQ at 667-68

### 1.   An Overview of the Facts of Person's That Were Found NOT to Constitute Bad Faith.

In Person's, Christman traveled to Japan, visited one of the Person's Co. stores, and there he purchased clothing bearing the "PERSON'S" mark.  Christman returned to the United States, and not only adopted the "PERSON'S" mark, but also copied the clothing line.  Moreover, he actually copied the "PERSON'S" logo design. Person's, 9 USPQ at 1479 (TTAB's findings of fact).  Such conduct was not enough to support a finding of bad faith because, although

13

Christman suffered from a lack of creativity, he did not intend to trade off of the goodwill of Person's Co.

### 2.    An Overview of the Facts of the Instant Case That Support OTC's Good Faith Prior Use.

Far short of the facts of <u>Person's</u>, the principal of OTC merely saw the "CANESTEN" trademark in Nicaragua years before adopting it in the United States.  OTC's packaging was designed by an independent commercial artist based upon samples of packaging from OTC's manufacturer, <u>not</u> Bayer's packaging.  OTC also obtained a trademark search and legal advice from trademark counsel soon after beginning use.  Finally, OTC duly applied to register its "CANESTEN" trademark in the United States Patent and Trademark Office and received a valid U.S. Trademark Registration.

### D.    Bayer's Rights Under the Treaties are Not Broader Than the Established U.S. Law and are Not Broader Than Those of United States Citizens.

Counts II and IV of Bayer's Re-Amended Counterclaims purport to state claims for relief under the Paris Convention and the Pan American Convention.  The introduction of the treaties, however, does not alter the clear result in this case.  The stated purpose of these treaties is to assure nationals of member countries effective protection against unfair competition. Paris Convention, Article 10 bis; Pan American Convention, Articles 20-22.  <u>See</u> <u>Vanity Fair</u>, 109 USPQ at 442 (the Paris Convention is a "compact between the various member countries to accord in their own countries to citizens of the other contracting parties, trademark and other rights <u>comparable</u> to those accorded their own citizens by their domestic law. ... But that protection has its source in, and is subject to the <u>limitations of American law</u>.") (emphasis added); <u>see also</u> 4 McCarthy §29.10[1].

14

The conventions require only that foreign nationals be given equal protection under the trademark and unfair competition laws of each contracting state to that accorded domestic citizens.  It does not provide that foreign nationals be given better treatment. French Republic v. Saratoga Vichy Spring Co., 191 U.S. 427, 438 (1903).  On this subject, McCarthy writes, the Paris "Convention is not premised upon the idea that the trademark laws of each member nation shall be given extraterritorial application, but on exactly the converse principle that each nation's laws shall have only territorial application."  4 McCarthy §29.10[1].  Bayer's rights are equal to those under domestic law, not greater.  The domestic law on point, as stated above, is clear; OTC's adoption, use, and registration of the trademark "CANESTEN" does not constitute unfair competition.  A U.S. complainant would have no greater remedy, and neither should Bayer.

Moreover, the Pan American Convention is precluded[2] as a source of relief. Article 21 expressly states that certain acts of unfair competition shall be repressed under its provisions when they are not effectively dealt with under the domestic laws of the contracting states.  Article 21, Pan American Convention.  As stated above, the treaty cannot grant broader rights to non-nationals than it does to nationals.  United States law does "deal with" unfair competition (especially regarding trademark use), and it is inappropriate to extend to non-nationals any rights that nationals do not have under domestic law.  Bayer does not get

---

[2]   The Court previously denied OTC's Motion to Dismiss based upon a related argument as to all aspects of unfair competition. However, the Court specifically noted that the holding of Scotch Whiskey Ass'n v. Majestic Distilling Co., 958 F.2d 594, (4th Cir. 1992), would operate to limit relief if the issue were narrowed to trademark use only, as is the case with this Motion. [Judge Davis' Order dated February 29, 1996, p. 11].

"better" treatment than U.S. citizens.

Similarly, Bayer's assertion of Article 7 of the Pan American Convention must fail because Bayer has not complied with "the requirements established by the domestic legislation in [the United States]...." Article 7.  4 McCarthy §29.0[4] (statutory issue is 15 U.S.C. §1052(d)).   A subsequent U.S. statute, namely the requirement of prior use in the United States contained in §2(d) of the Lanham Act, imposes a limitation on the universality that lurks in the facial reading of the Pan American Convention.   Finally, Bayer has no intention to commence use in the United States, and therefore, cannot claim a "preferential right." 1 Ladas, 1797.   The foregoing is in addition to Bayer's inability to meet the strict proofs necessary under Article 7, as discussed at Section II.C.

To allow Bayer to claim trademark rights in this country without demonstrating prior use (or fame) in this country would be the equivalent of affording better treatment to a foreign national than a U.S. citizen receives.   French Republic, 191 U.S. at 438.

### III. BAYER HAS NO STANDING TO ASSERT PAN AMERICAN CONVENTION.

Here, a German corporation asserts an antique treaty, the Pan American Convention[3], to which Germany is not a member.  Bayer does not have standing to assert the Pan American Convention.

Bayer alleges in Count IV of the Re-Amended Counterclaims that OTC violates Article 7 and Articles 20-22 of the Pan American Convention.   The Pan American Convention is self-executing, but Bayer also alleges the treaty implementation legislation at §44 of

---

[3]      The members of the Pan American Convention are Columbia, Cuba, Guatemala, Haiti, Honduras, Nicaragua, Panama, Paraguay, Peru, and the United States.  A copy of the Pan American Convention is available to the Court in the federal library.   Callman, Callman, Unfair Competition, Trademarks, and Monopolies, Appendix 55 (1995).

the Lanham Act, 15 U.S.C. §1126, in Count I.

The benefits of both the Pan American Convention and §44 of the Lanham Act are limited to "national[s]" of the contracting states. Paris Convention, Article 1; 15 U.S.C. §1126(b) and (c). Although Bayer does not specifically allege Article 1, the scope of Article 1 defines the entire treaty. <u>Aircraft Mech. Ass'n v. Atlantic Coast Airlines, Inc.</u>, 55 F.3d 90 (2d Cir. 1995)(individual sections should not be interpreted in isolation, but as part of the entire scheme). Where the literal interpretation is ambiguous, or worse, absurd, the courts look to the intent of Congress. <u>Aslandis v. U.S. Lines, Inc.</u>, 7 F.3d 1067 (2d Cir. 1993); <u>Hyundai Merchant Marine Co. Ltd. v. U.S.</u>, 159 F.R.D. 424 (S.D.N.Y. 1995); <u>Henshke v. New York Hospital - Cornell Medical Center</u>, 821 F.Supp. 166 (S.D.N.Y. 1993). Of course the most relevant time for determining the meaning of such language is when the statute or treaty was enacted. <u>MCI Telecommunications Corp. v. AT&T</u>, 114 S.Ct. 2223 (1994).

The pertinent language of §44 of the Lanham Act clearly reveals that the intent of Congress in accepting international trademark treaties is to limit their application to citizens and nationals of the contracting states. 15 U.S.C. §1126(b) and (c) ("Any person whose country of origin is a party to any convention or treaty relating to trademarks....")("the country of origin ... is the country in which he has a bona fide and effective industrial or commercial establishment ... in which he is domiciled, or ... the country of which he is a national."). Indeed, the Pan American Convention was specifically delineated in the prior version of §44, which was amended in 1962 to use the general language of "any convention or treaty." 15 U.S.C. §1126(b)(amending 15 U.S.C. §1126(b)(1962)). This is supported by the legislative history:

17

> "There has been no serious attempt to fully
> secure <u>nationals of countries signatory to the
> conventions</u> their trade-mark rights in this
> country and to protect them against the wrongs
> for which the protections has been guaranteed
> by the conventions."

S. Rep. No. 1333, 79th Cong., 2d sess., 4 (1946)(emphasis added),
<u>reprinted in</u> 1946 U.S.C.C.A.N. at 1276.

As stated, Bayer is a corporation of the Federal Republic of
Germany.  Although Bayer may own registrations in countries that
are members of the Pan American Convention, Bayer cannot be
considered a national, domiciliary, or citizen of any, even under
the broadest interpretation.  The treaty and statutory definitions
extend to entities that have a "commercial establishment" in a
contracting state. Pan American Convention, Article 1; 15 U.S.C.
§1126(b) and (c).  The testimony given by Bayer executives has been
that Bayer organizes subsidiaries in most countries, including the
Pan American countries, which is done for taxation reasons and to
comply with the laws of each particular country.  Importantly, the
status of a subsidiary, even a wholly-owned subsidiary, is not
relevant to the determination of whether an entity is entitled to
the benefits of a treaty.  <u>In re Aktiebolaget Electronux</u>, 182 USPQ
257 (TTAB 1974).  This comports with U.S. law regarding similar
analyses. <u>Frito-Lay, Inc. v. Procter & Gamble Company, et al.</u>, 179
USPQ 674 (D.C.Tex. 1973)(jurisdiction).

It defies common and legal sense to interpret the Pan American
Convention, of which Germany is not a member, as providing treaty
benefits to a German corporation in an action before a U.S.
District Court.  The Court should latch the "back door."  Bayer's
remedy, if any, is under the Paris Convention, of which Germany is
a member, and the domestic law of the United States.

18

## IV. <u>THIS COURT SHOULD ADOPT A RULE OF EFFECTIVE ABANDONMENT</u>.

Non-use of a trademark results in an abandonment. 2 McCarthy §17.01. After abandonment, the trademark is free for anyone to use. <u>Id</u>. An abandonment can occur in a limited geographic trade area. 2 McCarthy §17.07.

OTC submits that Bayer has abandoned the "CANESTEN" trademark in the trade area of the United States. Although this is not the classic case of abandonment, where use begins and then ceases, Bayer's conduct is actually <u>worse</u> than classic abandonment. Bayer has never even started using the trademark in the United States.

There is significant support for this argument in the international context. 2 McCarthy, §29.06. Under narrow circumstances, a foreign entity is entitled to register a trademark in the United States even though use has not commenced in the United States. 15 U.S.C. §1126. However, once a registration is granted, the registrant is "entitled only to the same national treatment as any other registrant." <u>Imperial Tobacco, Ltd. v. Phillip Morris, Inc.</u>, 899 F.2d 1575 (Fed.Cir. 1990)(never used in the United States). As such, a foreigner's registration (and its statutory implications upon use) is subject to cancellation for non-use. Here again, Bayer's conduct is actually <u>worse</u> than abandonment because Bayer never followed through with its application in 1977 to register "CANESTEN" in the United States.

The same international application of abandonment principles will apply to domestic use of a mark, in addition to the registration. <u>Shelby v. Ford Motor Co.</u>, 28 USPQ2d 1471 (C.D.Cal. 1993).

The instant case does not present a situation of a small foreign company "growing" into the global marketplace. Bayer introduces products and trademarks around the world at will, and

within short periods of time.  The United States is no exception
for Bayer.  However, Bayer decided <u>more than two (2) decades ago</u>
<u>not to use or register "CANESTEN" in the United States</u>.  Instead,
Bayer chose to use the trademark "MYCELEX" for its clotrimazole
products in the United States.  Bayer began to use and applied to
register "MYCELEX" in the United States in 1975, <u>approximately the</u>
<u>same time that "CANESTEN" was being launched by Bayer for</u>
<u>clotrimazole products in foreign countries</u>.

Bayer's conduct exhibits a purposeful abandonment of the trade
area of the United States regarding the "CANESTEN" trademark.  It
would be inequitable, in light of such conduct, for this Court to
allow Bayer to have a two-decade reservation of trademark rights
"maintained indefinitely."  <u>Imperial Tobacco</u>, 14 USPQ2d at 1395.
Our law abhors the "warehousing of trademarks." <u>Shelby</u>, 28 USPQ2d
at 1475.

## V.  CONCLUSION.

Based upon the undisputed issues of material fact and the
issues of law cited above, OTC respectfully suggests that partial
summary judgment should be entered as to OTC's continued use and
registration of the "CANESTEN" trademark.

Respectfully submitted,

By: _____
John Cyril Malloy, III
Florida Bar No. 964,220
Jennifer K. Lawson
Florida Bar No. 57,835
MALLOY & MALLOY, P.A.
Attorneys for Plaintiff
One Biscayne Tower, Suite 3760
2 South Biscayne Boulevard
Miami, Florida  33131
Telephone (305) 374-8418
Facsimile  (305)  374-8048

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing document was served upon Marlene K. Silverman, Esq. and Andres Rivero, Esq., GREENBERG, TRAURIG, et al., 1221 Brickell Avenue, Miami, Florida 33131, and Gregor N. Neff, Esq. and John R. Lane, Esq., CURTIS, MORRIS & SAFFORD, P.C., 530 Fifth Avenue, New York, New York 10036, Attorneys for Defendant/Counter-Plaintiff, via first class United States Mail, postage pre-paid, this 26th day of August, 1996.

By: _____
John Cyril Malloy, III
Florida Bar No. 964,220

JL6/B:5214SJ.CAN

# ADDITIONAL

# ATTACHMENTS

# <u>NOT</u>

# SCANNED

# PLEASE REFER TO COURT FILE